# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CB&I AREVA MOX Services, LLC<br><br>        Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>        Defendant. | Case No. __19-245__ C |

## COMPLAINT

Plaintiff, CB&I AREVA MOX Services, LLC ("MOX Services"), by and through its undersigned counsel, files this complaint and alleges as follows:

## PARTIES

1. MOX Services is a limited-liability company with its principal place of business in Aiken, South Carolina. MOX Services is the successor in interest to Duke Cogema, Stone & Webster, LLC, the original prime contractor under Contract No. DE-AC02-99CH10888 (the "Contract") awarded in 1999 to design and construct the Mixed Oxide Fuel Fabrication Facility ("MFFF") at the Savannah River Site on behalf of the National Nuclear Security Administration ("NNSA").

2. Defendant is the United States of America, acting through the Department of Energy ("DOE") and the NNSA, a component agency of the DOE.

## RELATED MFFF CASES

3. This action is related to several consolidated cases between the parties arising under the Contract that are currently pending before Judge Thomas C. Wheeler. *See CB&I AREVA MOX Services, LLC v. United States*, Case No. 16-950C, *et al.* (consolidated). The

1

history and purpose of the MFFF project and the other controversies between the parties are described in various pleadings filed in the consolidated cases. *See, e.g.*, Case No. 16-950C, Dkt. No. 21. The MFFF was designed to transform weapons-grade plutonium into mixed oxide ("MOX") fuel rods that could be irradiated in commercial nuclear power plants. The MFFF was intended to satisfy the United States' obligation under the Plutonium Management and Disposition Agreement between the United States and Russia. In recent years, the MFFF project fell out of favor with government officials and MOX Services' progress has been frustrated by inadequate funding and other actions by NNSA that have undermined the viability of the project. On October 10, 2018, NNSA completely terminated the Contract for convenience.

## NATURE OF THIS ACTION

4.    Through this complaint, MOX Services appeals a Contracting Officer's Final Decision ("COFD"), dated October 25, 2018, that disallows $526,895 in costs incurred by MOX Services during performance of the Contract. Exhibit A. In the COFD, the Contracting Officer asserted that the disputed amount consists of unallowable costs allegedly associated with improper electrical rework performed during MFFF construction. The electrical work at issue initially occurred in calendar year 2013 and the allegedly improper rework occurred from October 2014 to November 2015. The COFD is premised on a wholly unsubstantiated allegation that MOX Services completed certain electrical work with knowledge that it did not meet requirements and would have to be reworked. There is no credible evidence to support the underlying allegation or the Contracting Officer's legal position that the disputed costs are unallowable. For the reasons set forth in this complaint,

the COFD must be invalidated.

## JURISDICTION

5. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. § 7104.

## FACTUAL BACKGROUND

6. On all complex multi-billion dollar facilities in which design engineering must overlap with construction, some level of rework is expected and unavoidable.  On the MFFF, MOX Services has experienced significantly lower levels of rework than historically occurs in nuclear construction, both generally and specifically as to electrical work.

7. In 2013, MOX Services began the first major installation of electrical commodities with the goal of providing permanent power to the MFFF.  This effort became referred to as "Phase 1 Energization," the "Phase 1 Initiative" or "Milestone 1."  The Phase I Energization effort was critical to supporting startup testing planned for the MFFF.

8. On December 3, 2014, NNSA received a management referral report from the DOE Office of Inspector General ("OIG").  The management referral, OGI File No. 15-0061-C, reported an allegation that certain electrical work occurring as part of MFFF construction was not being completed to policy specifications.  Specifically, the referral alleged that cable trays and conduit had not been correctly installed and had to be removed and installed again, resulting in a waste of Government funds.

9. Upon information and belief, the allegation submitted to the OIG stemmed from statements made by an NNSA official to a bus full of members of the public that were touring the Savannah River Site, including the person who submitted the allegation.

10. A member of NNSA's construction team conducted an assessment of the allegation to determine if electrical rework had occurred because of a motivation other than to complete work to "policy specifications." The assessor personally selected seven electrical workers on the MFFF project and conducted interviews with those individuals. The assessor also identified seven non-conformance reports ("NCRs") and conditions reports ("CRs") that, in the opinion of the assessor, may have been the result of intentionally ignoring a project requirement.

11. The assessment resulted in a five-page Assessment Report, dated January 27, 2015, accompanied by three pages of the assessor's summarized interview notes. Exhibit B. The Assessment Report concluded that the allegations in the OGI referral were "substantiated." *Id.* at 5. Based on just seven interviews, the assessor made the sweeping generalization that "[t]here seems to be an opinion shared by a majority of electricians that they could be punished if they perform activities even if they do not meet project requirements" and "[m]any of the interviewees referenced the General Superintendent as the instigator for creating an atmosphere of performing non-compliant work under the pressure of retaliation by punishment." *Id.* In addition, the Assessment Report concluded that the "motivation of the General Superintendent appears to be a zealous desire to meet goals and 'look good' despite any issues that may prevent proper installation of materials." *Id.* The assessor acknowledged that this conclusion "was not shared amongst the interviewees unanimously," but "the assessor believe[d] this conclusion was shared by the majority and is a fair representation of the majority of all MOX electricians." *Id.* The assessor further determined that five of the seven NCRs and CRs identified were motivated by "pressure to

meet goals." *Id.* at 4.

12. The assessor's process in addressing the OGI referral was ad hoc and superficial, and the conclusions reached in the Assessment Report are deeply flawed and lack credible evidentiary support. The assessment relied on biased interviews with an unrepresentative sample of workers that were handpicked by the assessor to reach a preordained conclusion. Further, the NCRs and CRs identified by the assessor do not substantiate the conclusion that work was completed because workers were purportedly "pressured to meet goals" and ignore requirements.

13. The assessment made no attempt to place the complained-of NCRs and CRs in the context of the MFFF electrical work as a whole, much less in light of the entire design and construction of a multi-billion dollar plant. Nor did the assessor establish his expertise to conduct evaluations of MOX Services' work in the context of the nuclear construction industry. In isolation and in retrospect, one may quibble with particular examples of rework that, in the context of the entire project, are praiseworthy for their relative minuteness. The blinkered perspective of the assessment unreasonably omits any consideration of MOX Services' level of electrical rework against nuclear industry standards.

14. The assessment is also flawed because it failed to consider a variety of factors that may cause electrical rework during the construction of a highly complex, first-of-its-kind nuclear facility like the MFFF. For instance, unanticipated design changes may necessitate electrical rework to accommodate the design changes. The Assessment Report conveniently ignores that NNSA approved the commencement of MFFF construction with full knowledge that its designs were incomplete and it knew that there were significant cost and schedule

5

482820.1

risks associated with the potential for a design-build-design process. *See, e.g.*, Case No. 17-2017C, Dkt. No. 16-1, Exhibit 4. The Assessment Report failed to recognize that both parties expected design changes and associated rework to occur given the immaturity of the design at the time construction began.

15. The Assessment Report also failed to recognize that NNSA's inadequate and inconsistent funding of the project since 2013 may have contributed to the false perception by some that incomplete electrical work was installed "to meet goals" when, in reality, the work could not be completed due to a lack of funds. Some commodity installations were interrupted or ceased altogether when only partially complete due to project funding changes. The assessor failed to consider these and other factors that may have contributed to the false perception that incomplete work was installed simply to "meet goals."

16. On February 11, 2015, NNSA provided its Assessment Report to MOX Services. MOX Services took the allegations very seriously, determined that it needed to conduct an in-depth investigation into the allegations, and retained an independent, outside party to conduct the investigation. In contrast to NNSA's cursory and biased investigation, MOX Services' thorough investigation included interviews with forty-six individuals with knowledge of electrical installations on the project, including almost half of the electricians; the electrical subcontract management personnel; the current and former Vice Presidents of Construction; and other executive level MOX employees. MOX Services' in-depth investigation did not substantiate the allegation made in the OIG referral, or the arbitrary conclusions reached in the Assessment Report. On March 27, 2015, MOX Services provided a summary of its findings to NNSA. *See* Exhibit C.

17. On March 29, 2017, more than two years after NNSA provided the Assessment Report to MOX Services, the Contracting Officer issued a Notice of Intent to Disallow ("NID") $526,895 in costs allegedly associated with improper electrical rework completed from October 2014 to November 2015.  Exhibit D.[1]  The Contracting Officer's extreme delay in issuing the NID was inexplicable, and appears to be motivated by a desire to further damage MOX Services' financial position and to punish MOX Services for filing claims against the Government during the two-year delay period.  *See* Case No. 16-950C, Dkt. No. 21.

18. In the NID, the Contracting Officer relied on the same NCRs and CRs identified by NNSA's assessor.  Despite the thoroughness of MOX Services' investigation, the Contracting Officer refused to consider it and argued – without merit – that the investigation did not refute or discredit the allegation referred to the OIG.   Based upon the NCRs and CRs and the deeply flawed Assessment Report, the Contracting Officer arbitrarily concluded that MOX Services: "(i) failed to follow its requisite procedures that would have ensured the work in question met contractual quality requirements, (ii) knew or should have known of this failure, and (iii) knew or should have known that this failure would require it to repair, remove, replace, and take other associated corrective actions related to the work in question."  Exhibit D at 4.

19. Based upon these findings, the Contracting Officer asserted that the electrical rework costs at issue were unreasonable and therefore unallowable under FAR 31.201.  The

---

[1] The NID is incorrectly dated March 29, 2016 on page 1 of Exhibit D.  As shown in the top right hand corner of pages 2 through 5 of the NID, the Contracting Officer actually sent the NID on March 29, 2017.

7

Contracting Officer claimed that the disputed electrical rework costs were unallowable because MOX Services did not act as a reasonably prudent business when the electrical work was initially completed in calendar year 2013. *Id.* The Contracting Officer also claimed that the rework costs attributable to the failure to follow Quality Assurance ("QA") procedures are not "generally recognized as ordinary and necessary" to perform the Contract. *Id.* In essence, the NID reflected the Contracting Officer's desire to punish MOX Services for alleged QA non-compliances that were, according to a wildly speculative and unfounded allegation, due to an improper motive to "meet goals."

20.     In the NID, the Contracting Officer stated that "the Government has determined that the previously incurred, invoiced and reimbursed costs related to the rework totals $526,895." *Id.* at 5.  According to the COFD, "[t]his amount was calculated using the Contractor's rework logs as submitted to NNSA for discrete work, along with estimated material and overhead costs based on reasonable assumptions from the Contractor's bases of estimate (BOE) and actual cost experience." *Id.* The Contracting Officer failed to include any further information in the NID regarding how NNSA derived the amount in dispute.

21.     On April 26, 2017, MOX Services responded to the NID and objected to NNSA's proposed disallowance of the rework costs.  Exhibit E.  MOX Services explained that non-compliance with QA procedures is simply not a sufficient basis to disallow costs incurred for rework.  Indeed, the cost of rework is expressly allowable under Clause H.14 of the Contract titled, "Responsibility of the Contractor for Errors or Deficiencies."  Clause H.14(b) provides that "[t]he Contractor shall use its best efforts to ensure the correction or revision of any errors or deficiencies in the designs, drawings and other services furnished

8

under this contract, and making any necessary replacements."  Under Clause H.14(b), the cost of rework is expressly allowable except in the extreme situation where the "errors or deficiencies are due to fraud, lack of good faith, or willful misconduct on the part of any of the Contractor's directors or officers, or on the part of any of the Contractor's managers, superintendents, or other equivalent representatives, who have supervision or direction of (1) all or substantially all of the Contractor's business, or (2) all or substantially all of the Contractor's operations at the location where this contract is being performed."  Clause H.14(c).  The NID made no finding that the rework costs at issue were due to fraud, lack of good faith, or willful misconduct and did not cite Clause H.14 at all as a basis for the proposed disallowance.

22. In addition to Clause H.14, the contractual requirements that govern MOX Services' QA Plan contemplate that there will be situations where corrective actions must be taken to address "failures, malfunctions, deficiencies, deviations, defective material and equipment, and nonconformances." 10 C.F.R. Part 50, Appendix B, § XVI (Corrective Action).  Moreover, FAR 31.205-26 establishes that the cost of defective work shall be considered when computing material costs.  Thus, rework costs are not only "ordinary and necessary," they are expressly recognized as reasonable and allowable costs that should be paid under this cost-reimbursement Contract.

23. MOX Services' response to the NID also highlighted the fact that NNSA had not produced any credible evidence to support the allegation that MOX Services intentionally disregarded project requirements or "policy specifications."  The NID referred to the following NCRs and CRs identified in the Assessment Report: NCR-14-5877; NCR 13-

5403; NCR-14-5567; NCR 13-5318; NCR 13-4983; CR-13-349; and CR-14-026. The NCRs and CRs identified, and the assessor's interviews regarding the same, did not provide credible evidence that the work at issue was completed with the intent to ignore requirements in order to meet goals.

24. In the NID, NNSA failed to provide sufficient information to MOX Services to show how NNSA calculated the amount proposed for disallowance. This frustrated MOX Services' ability to respond and to understand what specific electrical rework was at issue. MOX Services' response noted that the NID was defective under FAR 42.801(c)(3) because NNSA failed to provide sufficient information to MOX Services regarding the costs it intended to disallow. FAR 42.801(c)(3) provides that an NID must "[d]escribe the costs to be disallowed, including the estimated dollar value *by item* and applicable time periods, and state the reasons for the intended disallowance." Accordingly, MOX Services requested additional information regarding the specific items of rework NNSA proposed to disallow.

25. In a letter dated May 31, 2017, NNSA responded and explained that "NNSA was compelled to make certain assumptions to arrive at a reasonable estimate." Exhibit F. NNSA's response included an estimate showing how it derived the amount proposed for disallowance. NNSA's estimate consisted of labor, material and level of effort costs associated with rework performed in connection with Phase 1 Energization. NNSA identified $205,515 in labor costs, $183,685 in material costs and $137,695 in level of effort.

26. On June 12, 2017, MOX Services responded to NNSA's letter and estimate. Exhibit G. MOX Services noted that NNSA failed to remedy the procedural defects in the NID because it did not adequately identify the specific items of rework used to derive the

estimate.  MOX Services also explained that the estimate prepared by NNSA further underscored the legal flaws in the NID.  According to NNSA, the cost of rework should be disallowed because the identified NCRs and CRs show that the original work was not performed in accordance with QA procedures.  The NCRs and CRs, however, do not support NNSA's central contention that the rework was done for an improper purpose, or that MOX Services "knew or should have known" that the work would need to be corrected at the time it was installed.  MOX Services explained that NNSA could not rely on those NCRs and CRs to identify allegedly improper rework because there is no basis to conclude that the rework in question was categorically different from all other rework that is generally allowable.

27.     MOX Services also observed that NNSA's misguided reliance on NCRs and CRs to disallow rework costs may have been prompted by an OIG Report, dated May 19, 2017.  The OIG Report suggested that NCRs "may be useful to evaluate some of the causes of rework" and could "serve as a valuable data point for NNSA when analyzing construction rework" or "identify[ing] rework trends."  Exhibit G at 2.  In response to the OIG, the Contracting Officer noted that preparing an estimate of unreasonable rework costs was difficult "due to the large volume of relevant data available but not yet organized, ***the overlapping nature of acceptable rework versus the allegation***, and the significant level of complexity of the issue generally."  *Id.*  Thus, in correspondence with the OIG, the Contracting Officer clearly understood that NCRs generally concern "acceptable rework" and therefore additional evidence of impropriety or wrongdoing would be needed to establish that the costs could be disallowed.  The problem with the NID, however, was that NNSA cited no credible evidence of wrongdoing to support its determination of unallowability.  The

NID cited only the NCRs and CRs and further asserted that "NNSA substantiated the allegation," which was that "the Contractor performed critical nuclear construction work without following its own procedures." Exhibit D at 3. NNSA never substantiated an allegation that MOX Services "knew or should have known" that it did not follow QA procedures, or that it "knew or should have known" that rework would be required, as alleged in the NID.

28. On October 25, 2018, more than a year-and-half after the NID was issued, the Contracting Officer issued the COFD. The Contracting Officer explained that, "[a]fter receiving MOX Services' response to the NOI, NNSA undertook a supplementary assessment of the rework issue." Exhibit A at 3. As a result of this "supplementary assessment," NNSA alleged that "self-imposed schedule pressure [was] the root cause of the nonconforming electrical work in question." *Id.* NNSA attempted to support this theory by citing NCR 14-5877 and two new CRs (CR-14-006 and CR-14-390) that were not referenced at all in the NID. NNSA claimed that internal deadlines set by MOX Services to complete the Phase 1 Energization effort "were arbitrarily imposed by MOX Services' management on its craft workers, with no benefit, and at great cost, to NNSA." *Id.* NNSA further asserted that those deadlines "are not required by, or specifically tied to, the Contract." *Id.*

29. While the Contract may not have specified when specific electrical milestones needed to be complete, it included an overall project completion deadline that required MOX Services to establish various milestone tasks. As with any construction contract, MOX Services needed to finish those milestone tasks on the path to overall project completion and it had the discretion to prioritize and sequence the scheduling of the various work elements in

12

accordance with its chosen method of performance.  The COFD ignores that there is nothing in the Contract that prohibited MOX Services from establishing internal goals for the completion of Phase 1 Energization to execute its chosen method of performance.

30.     By 2013, MOX Services was behind schedule because NNSA constructively changed and breached the Contract and severely delayed its progress towards completion. *See generally* Case No. 16-950C, Dkt. No. 21.  The COFD also fails to acknowledge or appreciate that, during the period in question, MOX Services was under enormous pressure from NNSA to make schedule progress in light of Government-caused delay that NNSA refused to recognize.  It was entirely reasonable and appropriate for MOX Services to establish internal deadlines for "Phase 1 Energization" in an effort to make schedule progress.

31.     In addition to faulting MOX Services for establishing Phase 1 Energization goals, the COFD also criticizes MOX Services for design changes made in rooms D-104 and D-106.  The design changes required MOX Services to remove and reinstall certain cable trays and supports.  The COFD argued that cable trays should not have been scheduled for installation without MOX Services ensuring supports were both installed and designed. According to the Contracting Officer, this was a "failure of management."  The COFD also alleges that "[s]imilar failures occurred with the installation of" certain Air Conditioning units. Exhibit A at 5. Specifically, the Contracting Officer contends that "[a] responsible Contractor would have ensured these [AC] units and associated supports were installed before the installation of the cable trays in each room." *Id.*  The COFD is fundamentally flawed in that it fails to recognize that design change-related rework is directly attributable to

NNSA's decision to proceed with MFFF construction even though it knew that the designs were immature. *See generally* Case No. 16-950C, Dkt. No. 21, ¶¶49-57.

32. The COFD also claims that certain management issues contributed to the electrical rework in question. Exhibit A at 5. Specifically, the COFD maintains that MOX Services should not have installed any cable in room D-106 because, at the time of installation, that room "was classified as blue, which means 'room coordination review is complete but action items are in the process of being resolved.'" *Id.* The Contracting Officer's position ignores that cable pull was required in room D-106 as part of the Phase 1 Initiative and the classification of a room as "blue" does not mean that cable should not have been installed.

33. Finally, the COFD alleges that "failures occurred in MOX Services' management of construction planning and scheduling." *Id.* The Contracting Officer claims that "MOX Services did not understand its own scope of work" for rooms D-104 and D-106 merely because the number of total activities and durations for those rooms increased over time. This oversimplified claim is completely without merit. The number of activities in the schedule and the total duration for work in these rooms is due to a variety of factors outside MOX Services control.

34. The COFD asserts four separate legal bases for NNSA's affirmative claim, all of which lack merit. The first three claims are based on contractual terms that were never even cited in the NID but suddenly appeared in the COFD as the central thrust of NNSA's affirmative claim.

482820.1

35. First, the COFD claims that "MOX Services failed to use its best efforts to perform in an efficient and effective manner" under Section B.1(a) of the Contract. Second, the COFD contends that "MOX Services performed the work in question with a lack of good faith" under Clause H.14. Third, NNSA alleges that MOX Services failed to follow certain provisions in Section J of the Contract that require the contractor to "ensure that construction considerations are incorporated into the design activities." Contract, Section J.II.A.8. Fourth, and finally, the COFD claims that the electrical rework costs at issue are not reasonable under FAR 31.201 based on the same arguments contained in the NID, *i.e.*, that no "prudent person in the conduct of competitive business' would have incurred the costs and the costs are not "generally recognized as ordinary and necessary" to perform the Contract.

36. On December 20, 2018, the Contracting Officer issued an Addendum to the COFD to notify MOX Services that the amount disallowed is considered a debt to the Government and must be repaid by January 22, 2019. *See* Exhibit H.

37. On January 10, 2019, MOX Services submitted a timely request for deferment of the debt pursuant to FAR 31.607-2. *See* Exhibit I. As of the filing of this Complaint, MOX Services has not received a response to its request for deferment.

## COUNT I (APPEAL OF THE COFD)

38. MOX Services realleges all of the preceding paragraphs as if fully stated herein.

39. The parties included a special Contract provision, Clause H.14, to govern MOX Services' responsibility to perform rework and receive reimbursement for those

efforts. Pursuant to Clause H.14(b), MOX Services was required to "use its best efforts to ensure the correction or revision of any errors or deficiencies in the designs, drawings and other services furnished under this contract, and making any necessary replacements." The concept of "best efforts" is implicit in the nature of a cost-reimbursement contract which focuses on the contractor's input rather than output. So long as MOX Services used its best efforts to correct, revise and/or replace errors and deficiencies, NNSA has a contractual duty to reimburse MOX Services for the cost of those efforts pursuant to Clause H.14 and FAR 52.216-7, the Allowable Cost and Payment Clause.

40. Clause H.14(c) carved out a narrow exception to the allowability of rework costs if NNSA can establish that the relevant "errors or deficiencies are due to fraud, lack of good faith, or willful misconduct on the part of any of the Contractor's directors or officers, or on the part of any of the Contractor's managers, superintendents or other equivalent representatives, who have supervision or direction of (1) all or substantially all of the Contractor's business, or (2) all or substantially all of the Contractor's operations at the location where this contract is being performed."

41. MOX Services acted in good faith and used its best efforts to complete the Phase 1 Energization effort in accordance with the terms of the Contract. MOX Services also acted in good faith and used its best efforts to correct, revise and replace any errors or deficiencies when it performed the electrical rework in dispute.

42. The COFD fails to allege that the electrical rework in question was caused by a lack of good faith on the part of any specific MOX Services' director or officer, or on the part of any manager, superintendent or other equivalent representative, who had supervision

or direction of (1) all or substantially all of the Contractor's business, or (2) all or substantially all of the Contractor's operations at the location where this contract is being performed, at the time of the allegedly improper work.

43. The rework costs at issue in the COFD were reasonable, allowable and allocable to the Contract under FAR Part 31.

44. Pursuant to Clause H.14 and FAR 52.216-7, Allowable Cost and Payment Clause, MOX Services is entitled to receive payment for all costs incurred to perform the electrical rework in dispute. NNSA's affirmative claim to disallow those costs is without merit under the terms of the Contract and the COFD should therefore be invalidated.

45. As of the filing of this Complaint, NNSA has not collected the disputed amounts from MOX Services through offset and MOX Services' deferment request remains pending. Should NNSA recoup any amounts subject to dispute in the COFD, MOX Services reserves its right to amend this complaint to allege a count for breach of contract and to seek damages for any amounts recouped.

## PRAYER FOR RELIEF

WHEREFORE, MOX Services prays that this Court grant the following relief:

46. Enter a declaratory judgment invalidating the COFD.

47. Grant MOX Services such other and further relief as the Court deems just and proper.

Dated: February 12, 2019              Respectfully submitted,

**ROGERS JOSEPH O'DONNELL**

s/Mark J. Linderman
Mark J. Linderman (Lead Counsel of Record)

482820.1

>Dennis J. Callahan
>Lisa N. Himes
>Stephen L. Bacon
>ROGERS JOSEPH O'DONNELL
>311 California Street, 10th Floor
>San Francisco, CA 94104
>(415) 956-2828 (Telephone)
>(415) 956-6457 (Facsimile)
>mlinderman@rjo.com